# DECISIONS

OF THE

# SUPREME COURT OF FLORIDA.

## OCTOBER TERM, 1874.

EZEKIEL E. SIMPSON, APPELLANT, VS. EMELIA J. AND HER
HUSBAND, BLAKE J. P. GONZALEZ, ERIC WINTERS AND
RICHARD C. WINTERS, BY THEIR GUARDIAN, BLAKE J. P.
GONZALEZ, APPELLEES.

1. Under the Constitution of 1868, and the statutes thereunder, the County
Court has no jurisdiction to enter and enforce a general judgment
against a guardian for a sum in excess of its ordinary civil jurisdiction.
2. Under the Constitution of 1839, and the statutes made thereunder, the
Judge of Probate had a general power to revoke the appointment of
a guardian of the person and estate of an infant.
3. Where, pursuant to an understanding between the parties, the appoint-
ment of one guardian is revoked and the appointment of another
made, such proceeding cannot be called in question collaterally. The
court having jurisdiction of the subject matter, both the revocation
and the appointment are valid; nor is it necessary in such proceed-
ings to give the infant notice, the matter of guardianship being under
the exclusive control of the court, the guardian being its officer, and
the infant having no right to any particular guardian.
4. Upon such removal, it is a matter of course for the removed guardian
to come to an account, and upon his turning over the estate to his
successor, he is not responsible for the subsequent wasting of the estate
by such successor.

This is an appeal from a judgment of the Circuit Court
of the First Judicial Circuit of Escambia county, in which a
demurrer to a complaint was overruled. The complaint alleged
that Charles Winters died on the first of October, A. D.
1853, leaving considerable estate and three children—Eme-

2

lia J., who was then three years old, Eric, who was two, and Richard C., who was eight months. That he left no widow. That Lawrence F. Bronnum administered on the estate, and upon a final settlement on November 1, 1855, there were assets amounting to $6,804.33, subject to distribution. That on the 23d of October, A. D. 1854, Simpson, the defendant, was appointed by the Probate Court of Escambia county guardian of the persons and estate of the plaintiffs, and on the first day of November, A. D. 1855, he received, as guardian, from Bronnum, as administrator, assets to the amount of $6,804.33. That, as such guardian, he obtained a decree in June, A. D. 1855, authorizing the sale of the real estate of his wards. That such sale was had, and the sum of two thousand four hundred and fifty dollars was realized there-from. "That on or about the first day of January, A. D. 1856, pursuant to an understanding between the defendant and Bronnum, the defendant applied for and obtained an order from the Probate Court of said county discharging him from his said guardianship, and the said Bronnum applied for and obtained an order appointing him guardian of the persons and estates of the said Emelia J.; Eric and Richard C., and thereupon the defendant turned over to the said Bronnum all the assets in his possession, or under his control, belonging to his said wards, including the proceeds of their real estate, which the defendant had converted into money, as aforesaid, amounting in the aggregate to $9,-424.87." That said Bronnum is a non-resident of this State. That he has utterly wasted and spent the entire estate of his said wards. That the sureties on his bond as guardian, which he executed when he was substituted for the defendant, are, as well as the said Bronnum, insolvent; and that the defendant, Simpson, of all the parties connected with the substitution of the said Bronnum, is the only solvent and responsible party. That the income of their estate was sufficient to maintain them until they were sixteen years of age, after which they maintained themselves. That Emelia

J. intermarried with Blake J. P. Gonzalez, and that he was appointed guardian *ad litem* in this action of Eric and Richard C. Winters. That they were ignorant of their rights in the premises until after the close of the war, the records of the court having been buried during that time. That they have frequently applied to defendant to render an account of the assets, and to pay the said Emelia J. her portion, which defendant has refused to do.

Plaintiffs pray a reference, and that defendant give an account of his guardianship ; that the income of the estate of the infants may be deemed an offset to their maintenance to the time they attained the age of sixteen. That from that period an interest account may be made up, that defendant be adjudged to pay to Emelia the amount found to be due her, and to pay to a guardian of Eric and Richard C., to be appointed by the court, the sums due them respectively.

To this complaint the defendant interposed a demurrer. This demurrur was overruled, with leave to defendant to answer. From the consequent judgment, this appeal is prosecuted, and the following errors are here assigned :

1. That the Circuit Court erred in taking jurisdiction of this case.

2. That an issue of law was tried by a judge in vacation.

3. That judgment upon the demurrer should have been for the defendant, as the complaint did not state facts sufficient to constitute a cause of action.

*E. A. Perry*, for Appellant.

*Points.*—1. The Circuit Court had no jurisdiction. Constitution and Acts, 1868, and Statutes then in force, relative to Probate Courts.

*Authorities.*—Story's Eq. Pl. § 490; 2 Story's Eq. § 1330; 35 Miss. R., 428 ; 3 Oreg. R., 380 ; 65 N. C. Rep., 110, 186 ; 62 Penn. St. Rep., 436 ; 56 ib. 166 ; 4 Green Ch., (N. J.,) Rep., 159 ; 22 Mich. R., 288 ; 25 Texas, 783 ; 23 Ark. R.

93; 12 Rich. Eq., (S. C.) Rep., 196; 2 R. I. Rep., 153; 23 Vt., (8 Washb.) 306; 22 ib., (7 Washb.) 50.

2. The issue of law should have been tried by the court.

*Authorities.*—Code of Procedure and Amendment; Bouvier's and Blackstone's Definitions of " Court."

3. If the orders of the Probate Court can be avoided, the complaint shows no cause of action against defendant.

*Authorities.*—Thom. Dig., 210 § 6; 9 Miss., 227; 1 P. Wms., 43; Hovenden on Fraud, 466; LeBaron & Colquitt vs. Fauntleroy, 2 Fla., 276.

4. The orders discharging one and appointing another guardian cannot be impeached collaterally.

*Authorities.*—Harris vs. Gill, 2 (Md.) R., 42, 50; 2 Wallace, S. C., 210; 3 Wallace, 396; 2 Peters, S. C., 157; 3 ib., 193; 10 ib., 449; 2 Phil. on Ev., Sec. 3 and notes; 4 Amer. Ed.; Tyler on In. and Cov., § 173; 22 Barb. R., 178; 6 Port. (Ala.) 219; ib., 262; 7 Ala., 885; 29 Ala., 542; 41 Ala., 26; 1 Ala., 708; 7 ib., 855; 10 ib., 636; 28 Ala., 164, 218, (overruling 3 S. and P., 355 and 2 S., 331;) 13 Fla., 309; 14 Fla., 162; 11 Ala., 461; 11 Ill., 625.

5. If the orders can be enquired into in this proceeding, the complaint does not state facts sufficient to show them invalid.

*Authorities.*—Comstock vs. Crawford, 3 Wallace, 396; Grignon's Lessee vs. Astor, 2 How., 319; Perkins Execr'rs vs. Winters Adm's, 7 Ala., 885; Young vs. Lorain, 11 Ill., 633; Hart vs. Bostwick, and other authorities cited supra.; Constitution, 1845; Act of 1845; Act of Feb. 17, 1833; Act of Nov. 20, 1828; Aik. Dig., (Ala.) 251; Rev. St., N. C., 307, § 2; 33 Ala., 214: 1 Haywood, N. C., 303; 2 ib., 336; 1 Murphy, 38, 227, 231; 2 ib., 122; 11 Iredell L., 36; People vs. Wilcox, 22 Barb., (N. Y.,) 178; Tyler on In. and Cov. § 173; 5 Porter, 277; 1 Iredell Eq., 136; 2 ib., 565; 11 S. & R., 430; 2 Phil. on Ev., 73, 90, 93; Greenl. on Ev., § 525; 1 Starkie on Ev., 241.

*Argument.*—The Probate Court's exercise of jurisdiction was called into operation in the first appointment of guar-

dian, and continues while the infants remain the wards, and the guardian an officer of that court.

If concurrent, the court that first acquires shall hold the jurisdiction.

In Florida, neither the Circuit Court nor its Judge has supervisory jurisdiction in matters pertaining to the Probate Court, except on appeal.

If the Circuit Court, by virtue of its equity powers, can exercise an assisting jurisdiction when properly invoked, in this complaint there is no equity not properly cognizable by the Probate Court.

Is this "a matter concerning orphans and their estate?" Is Simpson, as respondents seem to claim, still their guardian, or are they without a guardian, and is it necessary and proper a guardian should be appointed, as they ask? Do they, as wards, complain against their guardian? Is an account required? We see that the Probate Court which has taken jurisdiction over these matters "has power to take cognizance of all matters concerning orphans and their estates, to appoint guardians in cases where it appears necessary and proper, and to hear and determine all complaints of wards against guardians, and require of them, from time to time, an account of the profits and disbursements of the estates," &c. Bush's Digest, 354. The Circuit Court cannot then entertain jurisdiction as a "suit in equity," for there is complete remedy in Probate Court; nor as a court of concurrent-jurisdiction can it wrest the jurisdiction from the Probate Court. Story's Eq. Pl., § 490.

But does the Circuit Court, under our constitution and laws, share with the County Court as a Court of Surrogate, Ordinary, Probate and Orphan's Court, the powers expressly and fully granted the latter?

Our constitution gives it full surrogate and probate powers, only subject to appeal; and Sec. 2, Art. 15, of the constitution, and the 16th Sec. of Act of 1868, give it all the powers that were prescribed by law as the powers of the

Judges of Probate, and imposed upon it all the duties, *except where, by the constitution, imposed upon other officers.*

Then the laws in force at the adoption of the constitution define the powers and duties of that court, and it certainly *shares* none of them with the Circuit Court or its Judge, for such of them, if any, as by the constitution are imposed upon that officer, are, by the act of the Legislature, excepted and taken from that court. Such powers and duties as are left to it would seem then to belong to it exclusive of all other officers or courts, subject only to appeal. So grant of "original jurisdiction in all cases in equity" cannot give concurrent powers—if it gives to one it takes from the other. That, at most, gives chancery powers, and however any of these powers may have been considered in the practice of the English courts, in this State they had become statute powers and could not be embraced in general grant of equity powers.

It may be well to note, that even in England guardianship was not embraced in general equity jurisdiction, but was limited to the Chancellor sitting in chancery. 2 Story's Eq., § 1330. As by our laws it seems to be limited to the Judge of County Court sitting as Probate Judge.

In the absence of any adjudication by this court upon the character of the jurisdiction of the two courts, we may look to the adjudications in other States having courts organized like ours, and with constitutions and laws not greatly dissimilar.

Thus in Mississippi the Supreme Court hold: "Our Probate Courts are established and regulated by our constitution and laws, and their jurisdiction is to be determined by these and not by the practice of the English courts. That jurisdiction was intended by our constitution to be full and ample, and has uniformly been held by this court to be in the main exclusive." 35 Miss., (6 George,) 428.

So in Oregon. The Supreme Court say, "The County Court of Oregon is to be regarded in probate proceedings

as of superior jurisdiction, it being a court of record, deriving its power as a Probate Court from the constitution." 3 Oregon., 380. And "the burden of showing that the court has not acquired jurisdiction is on the party who disputes it." . Ib.

"The Probate Courts of North Carolina have *exclusive original jurisdiction of a proceeding by a ward against his guardian for a settlement of the latter's accounts.* But they have no jurisdiction of a suit on a guardianship bond." 65 N. C., 110; ib. 186. .

So in Pennsylvania. "Under the act prescribing the powers and jurisdiction of the orphans' court, that court alone has jurisdiction to settle the accounts of guardians *as between them and their wards.*" 62 Pa. St., 436; ib. 166.

The Supreme Court of New Jersey hold: "This court has no power to remove an executor; that power belongs exclusively to the orphans' court." 4 Green, (N. J.,) 159.

So in Michigan. "The Court of Chancery in Michigan has no power to remove an administrator, the Probate Court having exclusive jurisdiction of the matter." 22 Mich., 288.

In Texas, where a guardian's sale of two slaves was reported to and confirmed by the County Court, and the wards instituted against a subsequent purchaser a suit in the district court alleging ownership, wrongful detention, &c., without making the guardian a party, pending which he settled his account and was discharged, it was *held* that the plaintiff's remedy was in the County Court. 25 Texas, 783.

So in Arkansas. "The Circuit Court, sitting in chancery, has no right to take from the Probate Court the determination of an administrator's responsibility upon the assets of the estate;" and its decree was reversed for want of jurisdiction. 23 Ark., 93.

In South Carolina, "equity has no jurisdiction in case of the fraudulent destruction of a will, whether of real or personal estate; the parties interested under it must seek relief in a Court of Probate." 12 Rich. (S. C.) Eq., 196.

.In Rhode Island, "the Supreme Court will not appoint a guardian after reversing a decree of the Court of Probate dismissing an application for the appointment of guardian, but will remand the case to the Court of Probate for that purpose." 2 R. I., 153.

In Vermont, "the Probate Court has exclusive jurisdiction, in the first instance, of the settlement of guardians' accounts." 23 Vt., (8 Wash.) 306.

And "entire and exclusive jurisdiction of the settlement of estates, to the same extent that jurisdiction of matters of contract or tort, is given to the common law courts. The court of chancery has not concurrent jurisdiction in this respect with the probate court, and will not interfere in the settlement of estates except to aid the jurisdiction of the probate court in those points only wherein its functions and powers are inadequate to the purposes of perfect justice, and then in the same degree and for the same reason that it interferes in other cases where the principal jurisdiction is in the courts of common law." 22 Vt., (7 Wash.) 50.

" Claims against an administrator, for money and property of the estate which have come into his hands during the administration, are exclusively within the jurisdiction of the probate court." Ib.

·In some of the States concurrent jurisdiction in the matters usually pertaining to probate courts is expressly given to other courts, more commonly in those States where there are separate courts of equity, possessing, in addition to general equity jurisdiction, powers specially defined by statute.

Thus in Wisconsin, by statute, there exists concurrent jurisdiction ; so in some matters in Alabama ; while in New York the Chancellor, seemed, under the statutes of that State, to have not merely concurrent but supervisory jurisdiction. That Chancellors Kent and Walworth, in their decisions in the cases of Andrews, 1 John. Ch., 99 ; in Matter of Nicoll, ib., 25 ; ex parte Crumb, 2 ib., 439, and the case of Dyer, 5 Paige, 534, did not base their claim to such

superintending power upon their general equity jurisdiction alone, but upon the peculiar statutes of the State, appears from their reference to the statutes. See notes *a, b,* 2 Kent's Com., 227.

The New York decisions seem the foundation of the doctrine so far as it has prevailed in this country of the supervising power of the Chancellor in matters of guardianship. Most of the States have limited that supervision to cases of appeal; so, I submit, has our own State.

Grant the Circuit Court's jurisdiction; admit as well the law as the facts asserted in the complaint; let plaintiffs have *all* they pray for, and to what an absurdity, to say nothing of conflict, it would lead! Bronnum would be guardian by virtue of his letters of guardianship from the Probate Court; Simpson would be guardian by election of the plaintiffs, and there would be a third appointed by the Circuit Court. Such would be the result of allowing the Circuit Court any other than appellate jurisdiction.

2. The Code (Sec. 201) prescribes that *an issue of law must be tried by the court,* unless it be referred. See Blackstone's and Bouvier's definition of court. Sec. 202 prescribes how other issues than those named in Sec. 201 may be tried.

Even if this is one of those cases in which, prior to the Code, the Judge, sitting as chancellor, might have passed final decree in vacation, the amendment, Chap. 1,832, Sec. 7, Acts of 1871, is an amendment of Sec. 202, and must be confined to other issues than those enumerated in Sec. 201, and could only apply to issues in this action other than an issue of law.

3. Granting that the Circuit Court had jurisdiction, and the issue of law was properly tried by a Judge at Chambers, the demurrer should have been sustained.

If the orders of the Probate Court can be avoided, the complaint shows no right of action against defendant. It does not surcharge and falsify his accounts, but, on the contrary, shows he "paid over all the assets in his possession

or under his control," as by the court he was ordered to do, for "an order of court removing a guardian and appointing a successor is equivalent to an order to pay over the money in his hands to his successor," (9 Miss., 227,) shows he paid to the party authorized to receive, viz: the party holding grant of guardianship from the Probate Court of the county in which were the estate and persons of the plaintiffs, then not of age to choose a guardian, which payment, and the receipt of it by plaintiffs' guardian, (and not the order of court discharging him from the guardianship,) discharged defendant from liability. Thomp. Dig., 201, § 6. Even if plaintiffs can, after seventeen years living under their guardian, and acquiescing in all his acts, elect to avoid orders of a court, "entered of record, and not subsequently reversed or set aside," and that too while they are still minors. For as held by Holt, C. J., in Blackborough vs. Davis, 1 P. Wms., 43, "the grant, though made contrary to the statute, is not void but voidable, and acts done under it before it is actually avoided will be valid." So also in Hovenden on Fraud, 466 : "If the grant has been made irregularly or obtained by fraud or surprise." In LeBaron & Colquitt vs. Fauntleroy, 2 Fla., 298, this court, in a case analogous to this, adopted the following language of Ashurst, J. : "I am of opinion that the plaintiff has no right to call on the defendant to pay this money a second time, which was paid to a person who had at that time a legal authority to receive it."

4. But the orders of the Probate Court can neither be avoided nor inquired into in this collateral proceeding. That can only be done by the court that rendered them, or by appeal therefrom. 2 Wallace, S. C., 210; 3 Wallace, S. C., 396; 2 Howard, 319; 2 Peters, S. C., 157, 165, 169; 3 Peters, 193, 202, 207; 2 Green. on Ev., Redfield's Ed., note to § 339; 4 McLean, 442; 13 Fla., 309; 14 Fla., 162–174; 11 Ala., 461–465; 11 Ill., 625–633.

It is seen this court's decision in Hart vs. Bostwick is

sustained by all the authorities, and is conclusive of the whole case, and upon that appellant might safely rest.

5. If the orders of the Probate Court can be inquired into in this proceeding, the complaint does not state facts suffi-cient to show them invalid. Authorities above cited.

It does, however, state facts sufficient to show the juris-diction of the Probate Court over the subject matter, the guardianship, and the person removed, and that the court had been called upon to exercise its jurisdiction. 2 Howard, 533; 2 Wallace, 216; 7 Ala., 864, and other cases cited.

It does not show that defendant's appointment, being a temporary one to represent the estate in the settlement of administrator's accounts, had not expired by limitation at the time of his discharge.

It does not show that the removal of one and appointment of another guardian was not for the best interest of the in-fants; that Bronnum was not, as their nearest relative, en-titled to the office rather than Simpson, a stranger.

But consider these orders upon respondents own grounds. In the trial below they rested their case upon two main propositions:

1. Denied the power of the Probate Court in Florida to displace or discharge a guardian.

2. They claimed that the order of discharge, and subse-quent order of appointment, are void, in consequence of that want of power, and because the infants were not served with process and represented by guardian *ad litem*.

Sec. 9, Art. 5, Constitution of 1845, gave the Legislature power of providing for appointment of "officer to take pro-bate of wills, to grant letters testamentary of administration and guardianship, to attend to the settlement of the estates of decedents and of minors, and to discharge the duties usually pertaining to Courts of Ordinary, subject to the direction and supervision of the Courts of Chancery, as may be provided by law." Thomp. Dig., 57.

By virtue of that power, the Legislature did provide for

the appointment of such officer, to be called Judge of Probate, to perform the duties above enumerated; and it further provided by law how the Courts of Chancery should exercise the direction and supervision mentioned in the Constitution, viz: by appeal.   Act July 25, 1845.   Thomp. Dig., 57.

In the same act the Legislature provided that the Judge of Probate should have all the powers and perform all the duties theretofore prescribed by law, as powers and duties of Judge of County Court when acting as Court of Ordinary.   Thomp. Dig., 58, § 3.

Refer to act of Feb. 17, 1833, to ascertain the powers and duties of Judge of County Court when acting as Court of Ordinary.   He "had the power either in open court or in vacation to take probate of wills, grant and revoke letters testamentary and letters of administration, *appoint and displace guardians* of infants," &c.   Duval's Compil., 276.

That the Legislature intended to and did invest Probate Judges with power to displace or discharge guardians, see the same act of July 25, 1845, Secs. 4–5, which required him to record, &c., all orders and decrees made by him in relation to estates, "*the appointment of guardians* and *the revocation of such appointment.*"

All these acts are in conformity to, or in the words of Sec. 1, Art. 17, are "not repugnant to the provisions of" the Constitution, (Constitution 1845,) for the framers of the Constitution are supposed to have had in view what powers and duties pertained to Courts of Ordinary, not only in the Territory of Florida, but according to the common law of America, if not of England.   We have seen that in Florida Courts of Ordinary had power to appoint and displace, (which Webster defines discharge,) so we find in the common law of America the Judge of Probate, or officer of same character, has the same power to appoint and to remove.   2 Kent Com., 37, and in 1 Bouvier's Inst., 147, § 360, "A guardian may be discharged at his own request."

Simpson v. Gonzalez, et al.

See Aik..Dig., 39, for clause in Alabama Constitution, under which the statute from which the Florida statute seems to have been copied was passed. Aik. Dig., 251, § 26.

See North Carolina statute; Rev. Stat., N. C., 307, § 2, and statutes and practice of other States. See reports of of other States for instances of .the exercise of similar powers by Probate Courts.

The court having power to displace, it is claimed the orders should have been made only on complaint of wards. We find no such restriction to court's power in the statutes above cited; nor do we in an older statute, which plaintiffs seem to have had in view, (the act of November 20, 1828, Thomp. Dig., 225, § 2,) and to have wrongly construed. Properly construed, it is another statute, giving power to displace, as the court displaced defendant. It requires the Judge of Probate, 1st, to hear and determine all complaints of wards against guardians; 2d, to require of them counter security, *when necessary*, (not when the wards complain;) 3d, displace them (not upon complaint of wards,) but when *to them* it may seem equitable and right. This statute, instead of restricting power, places the whole subject matter of guardianship within the discretion of the Court of Probate.

Indeed it would seem self-evident that court's power to displace a guardian against his will, included power to do so with his assent. But as to this objection, see 3 Wallace, 403, 404, and 11 Ill., 633. But counsel for plaintiffs at the trial below argued that court never granted a discharge to Simpson—contended it was a resignation. The complaint does not so charge; it alleges that "defendant applied for and obtained an order from the Probate Court discharging him." There is material difference.

Resignation is exercise of party's privilege; discharge is exercise of court's power; and demurrer is to a complaint alleging a discharge, or the exercise of the court's power. So if court's power is shown, it is conclusive, for " whether its decision be correct or otherwise, its judgment, until re-

versed, is binding on every other court." 2 How., 343, and authorities cited.

But plaintiffs objected to the validity of these orders, because the infants were not served with process and represented by guardian *ad litem*. This objection, as indeed are all the others, as well as the argument and authorities presented in behalf of plaintiffs, is predicated upon the hypothesis that the infants were necessary parties to these orders, to the determination by the court as to who should and who should not be guardian. The complaint does not show that. It shows they were respectively five, four and three years old, and could neither by themselves, nor by others, have any voice in the determination of a matter that was absolutely and exclusively within the discretion of the Judge of Probate. 33 Ala., 214 ; 1 Haywood, N. C., 303 ; 2 ib., 336 ; 1 Murphy, 38, 227, 231; 2 ib., 122; 11 Iredell L., 36 ; 22 Barb., N. Y., 178 ; Tyler on In. & Cov., § 173, and authorities generally.

This case was argued as if these orders were orders or judgments against the infants, or as if the complaint surcharged a final settlement, and these were orders purporting to relieve defendant from liability for his acts while guardian, and not simply orders determining who shall and who shall not hold an office purely within the gift of the Probate Court, for guardianship is an office, (8 Cowen, 355,) and the guardian derives his power, not from an act of the ward, but by appointment of the court. 5 Porter, 277. To this office, it does not appear these plaintiffs had the shadow of a claim. The complaint shows no parties claiming a right to the office other than Simpson and Bronnum ; Simpson, by reason of an appointment, (which may have been an "improvident one," and thus revocable by the Judge of Probate, without statute power—1 Williams on Exec., 484, note 2)—and Bronnum by reason of his being the nearest relative of the infants ; which fact, though it does not affirmatively appear from the pleadings, the court may infer, from his having ob-

tained the grant of administration. (2 Phil. on Ev. 85.) If, then, we apply the principles applicable to proceedings *in personam* to these orders, and adopt Bouvier's definition of parties, and Story's doctrine as to necessary parties, there were before the court all the "parties directly interested in the subject of the suit," viz : the office of guardian. A creditor or a debtor of the estate has, in proportion to his credit or debt, as much interest in the estate, and is as necessary a party to, and might as reasonably be permitted to impeach these orders, as the plaintiffs.

But the courts of England and America, and a long and uniform practice, have established a different principle, as applicable to sentences or decrees of Ecclesiastical Courts in England, and of courts coming in place of them in this country, whether called Court of Surrogate, Judge of Probate, Orphans' Court or Ordinary. And it is this : When those sentences or decrees are upon a subject matter within their jurisdiction, and confer upon or deprive a person of a *status* or legal character, they are in the nature of proceedings *in rem*, and have a conclusive effect even with respect to persons who are not parties to the proceedings.

2 Phil. on Ev., 4 Amer. Ed. 73, 74, and note top of page 79. " And they have the effect of establishing conclusively such state and legal character against all persons;" (ib., 90, 93 ; also, 11 S. & R.; 430 ; 1 Greenleaf on Ev., § 525 ; 1 Stark. on Ev., 241 ; 2 Howard, 338 ; 6 Porter, 219 ; 2 Peters, 168.)

This explains why no cases can be found where letters testamentary or of administration or guardianship have been held void, voidable or inconclusive, against legatees, distributees, infants or creditors, because they, however much interested in the estate and its proper administration and management, were not parties of record to the proceedings by which the legal character or *status* of those respective officers was conferred.

That this doctrine was fully recognized in Florida at the

date of these orders, see all the statutes, *pari materia,* in force on the 1st of January, 1856.

For instance, that giving power to the Probate Court to grant probate of wills, letters testamentary, and of administration and guardianship, (Thomp. Dig., 195;) also, to authorize the loan of money of minor, (Thomp. Dig., 207, § 2;) and the sale of real estate of minor, (Acts 1850–1, p. 129.)

So, too, as in proceedings *in rem,* any person, whether party to record or not, feeling aggrieved by any order of that court, could intervene and take appeal to the Circuit Court. Sec. 46, Act Nov. 20, 1828; Duval Com., 180; Act 1845; Thomp. Dig., 365.

The court's power then being complete and the infants not being necessary parties to the record, that power was brought into exercise, and " the granting " the orders " is an adjudication upon all the facts necessary to give jurisdiction, and whether they exist or not is wholly immaterial, if no appeal is taken. The record is absolute verity, to contradict which there can be no averment or evidence." 2 How., 340.

This, and the maxim *de fide et officio judicis non recipitur quæstio,* and the language of this court in 11 Fla., 137: " The law having entrusted to the courts the administration of justice, it is always presumed that every tribunal, by whom a cause has been tried, has done what was right," and the decision of this court in Hart vs. Bostwick, are full answers to all the objections alleged against these orders, and fully justify the conclusion—

That the order discharging Simpson and vacating the office of guardian, and the subsequent order appointing Bronnum, until revoked by the court that made and placed them upon its records, or reversed by an appellate tribunal, are, in every court in this State at least, conclusive against the world to show that on the 1st day of January, 1856, there was taken from Simpson and conferred upon Bronnum the " legal character" of guardian of Emelia J., Eric and Richard C. Winters; and that this defendant, when he "*paid over all*

*the assets in his possession*" to the guardian of those infants, discharged all his liabilities to them or to their guardian.

This appellant does not, by the order discharging him from the office of guardian, seek to cover any charge that may be made of unfaithfulness in his duties while he held the office; on the contrary, he invites the closest scrutiny into his acts and accounts; but he does claim that he had a right to be guided by the laws and principles of practice in the courts at that time, and especially by the decision of this court in the case of LeBaron and Colquitt vs Fauntleroy, which arose in his own county; and he protests against being punished to-day for doing on the 1st day of January, seventeen years ago, what he would then have been punished for not doing; and he also protests against being made the pivot upon which is to move the vast revolution and reform in the practice of Probate Courts, which, in behalf of the plaintiffs, the judge at the trial below was so strenuously urged to inaugurate.

As to the special ground of demurrer, it will readily appear that the points made and authorities cited above, apply with still more force to the special ground of defect of parties. No court would presume to inquire into Bronnum's appointment in a proceeding to which he is not a party. 11 Ala., 465. And unless the Circuit Court can do that, and has power to repeal his letters in this proceeding, the prayer of the complaint cannot be granted. 2 Phil. on Ev. 106; 3 Gill and John., 103, 113; 18 Ala., 34; 17 Ala., 119.

It was argued in the trial below that the complaint alleging Bronnum to be out of the State, the maxim, *lex non cogit ad impossibilia*, was answer to special ground of demurrer. He is an indispensable party here, and it will be seen by reference to Story's Eq. Pl., §§ 81, 82, 83, the impossibility of making him a party, if it existed, would be no excuse.

The appellant contends that, clearly upon this ground, if there were no other, the demurrer should have been sustained.

3

*Richard A. Campbell* for Appellees.

The question arising upon the demurrer is, whether the order of the Probate Judge did, in law, discharge appellant from his office and responsibility of guardian. The appellees maintain the negative—

1st. Because the Probate Judge could not constitutionally grant such an order.

2d. The order was unauthorized by the statute law.

3d. It was void because it was granted in a proceeding to which the appellees were not parties, and of which they had no notice.

4th. The order was in effect only an acceptance of the resignation of a guardian, and therefore the unauthorized official sanction of a nugatory act.

5th. It was the result of an agreement to which the appellees were not parties.

6th. The understanding between appellant and Bronnum, coupled with the orders and the acts of the parties under and in connection with them, made Bronnum appellant's agent.

First. The Judge of Probate could not constitutionally grant an order discharging the appellant from his office and responsibility of guardian.

The 9th section of Art. V of the Constitution of 1845 declared that " the General Assembly shall provide by law for the appointment in each county of an officer to take probate of wills, to grant letters testamentary, of administration and guardianship ; and to attend to the settlement of the estates of decedents and of minors, and to discharge the duties usually appertaining to Courts of Ordinary, subject to the direction and supervision of the Courts of Chancery, as may be provided by law."

The office of Judge of Probate was, therefore, one of limited powers. 5 Paige, 534 ; 1 John. Ch. R., 99 ; 3 Sum. C. C. R., 338 ; 1 Curtis C. C. R., 457.

In matters relating to infants, two powers only are con-

ferred on him :· 1st, to grant letters of guardianship ; 2d, to attend to the settlement of their estates.

The enumeration of certain powers is an exclusion of others not enumerated. Cooley's Con. Lim., 64.

The only other powers which Judges of Probate could enjoy in matters relating to infants would be such as arise by necessary implication·from the powers expressly granted. 1 Kent, 346, 520; Cooley's Con. Lim., 63-4.

But only such powers could arise by implication as are necessary to execute the express powers. Ib.

The power to discharge does not arise by necessary implication from the power to grant letters of guardianship. 5 Paige, 534.

Besides, the appointing power had been exhausted by securing an efficient and responsible guardian. 6 Ga., 432.

The power to settle the accounts of such guardian could not raise by implication the power to remove him, much less to discharge him from office and responsibility upon his mere resignation.

The implied powers of the Judge of Probate, resulting from the express constitutional authority to attend to the settling of the estates of infants, will be found in sec. 37, Act Nov. 20, 1828, (Thomp. Dig., 210.)

To appoint guardians ; to call them to account ; and to discharge or remove them, are three distinct and substantive chancery powers. 2 Kent, 236-7 ; 1 Sto. Eq. Ju., § 446 ; 2 ib., § 1338-9 ; 21 Ala., 363.

The 8th section of Art. V of the Constitution of 1845 gave original equity jurisdiction to the Circuit Courts until Courts of Equity should be established.

The power to remove and discharge not having been granted to the "officer" created by the 9th section, it passed as a part of its chancery jurisdiction to the Circuit Court under the 8th section of Art. V of the Constitution of 1845.

"The duties usually appertaining to courts of ordinary," referred to in the 9th section, Art. V, of the Constitution of

1845, do not embrace either equity or common law judicial powers.

The term "courts of ordinary" is used in its American sense, and as a designation of courts exercising such special powers as the statute law confers on them. 2 Bo. Dic., 270.

The duties and powers of such courts could not be compressed within the limits of the common law definition of courts of ordinary, nor could they be so expanded as to make all the laws of the several States conferring powers on their respective courts of ordinary rules of action for the Probate Judges of Florida.

The words, " *duties usually appertaining to Courts of Ordinary,*" are only indicative of a class of duties which the Constitution provided should be imposed by the statute law of the State on the officer designated; those duties being of a like character with those imposed by other States on their courts of ordinary.

If, then, the power to discharge a guardian is a chancery power, it was not embraced amongst "the duties usually appertaining to a court of ordinary."

Two good reasons existed for withholding from the Probate Judge the power to discharge:

1st. To afford the rights of the infant an additional safeguard by securing to him the judgment of a court of chancery upon the expediency of continuing the guardian in his trust, instead of leaving it to the appointing judge to review the qualifications of his own appointee.

2d. To secure to the infant the safeguard which the forms of equity afford in case the guardian sought relief from his trust.

This case illustrates the wisdom of withholding the power of removal and discharge from the Probate Judge.

Second. The order was unauthorized by the statute law.

The act of the 25th July, 1845, (Thomp. Dig., 57-8,) in carrying into effect the 9th section of the Vth Article of the Constitution, employed the language of the section in bestowing their powers on the Probate Judges.

The 1st section of Art. XVII of the Constitution of 1845 continued in force all laws not contrary to its provisions.

In 1845, when the Constitution took effect, the only legislation in relation to infants and guardians was contained in the 1st, 37th and 50th sections of the act of Nov. 20th, 1828, (Thomp. Dig., 210, 224-5.)

The first clause of the 1st section of the act of 1828 provides for the hearing and determination of complaints by wards against guardians, for counter security, the displacement of guardians, and the making of such orders as may seem equitable and just. The second clause of the section requires the guardian to make inventories of receipts and disbursements of the ward's estate, and directs the Judge to make such orders as may be just.

Everything authorized to be done under the first clause of the section (displacing the guardian as well as the rest) must be founded on a complaint by the ward.

When we ask from whom counter security was to be exacted ; who was to be displaced ; in relation to whom orders were to be made ? the only answer that comes from the law is, the guardian against whom complaint has been made.

In this case, there being no complaint, there was wanting " the act required to call into exercise the power of the court." 3 Wall, 396.

The 37th section of the act of 1828 relates to enforcing settlements by guardians and others.

The county courts, being courts of equity, (Duval Comp., 89, 90, 130, 270,) were empowered by the 50th section of the act of Nov. 20th, 1828, " to take cognizance of all matters concerning infants and their estates." But the "officer" created by the 9th section of the Vth Article of the Constitution of 1845 was intrusted with only two chancery powers.

The provision in the act of 25th July, 1845, (Thomp. Dig., 58,) for recording " the appointment of guardians and the revocation of such appointment," must relate to revocations to be made by the Circuit Court, unless the 1st section

of the act of 1828, relating to the displacement of guardians upon "complaint," may be construed to confer a limited power of revocation.

The power of revocation, *eo nomine*, is bestowed on the county court by the 31st section of the act of 1828 in the cases of executors and administrators, but it is silent as to guardians. Thomp. Dig., 210.

The power of revocation implies action on the part of the Probate Judge to protect the interests of those interested in the estate against misconduct or inefficiency. 14 Fla., 162.

The power the Judge attempted to exercise in this case was *to discharge* the guardian from office and responsibility at his own instance and for his own benefit.

The power to discharge executors and administrators from office and responsibility has, under certain restrictions, been bestowed on the Judges of the Court of Probate. (Thomp. Dig., 211–12.) But in no form, nor to any extent, has it been bestowed in the case of guardians. The reason is obvious.

The duration of the office of administrator or executor is the time required for a complete fulfillment of the trust. 1 Fla., 332.

The duration of a chancery or statutory guardian's office is the minority of the ward. 2 Kent, 236 ; 1 John., 24. The attainment of majority by the ward works the guardian's discharge from office ; and the surrender of the estate to the ward constitutes the guardian's discharge from responsibility.

Even a court of chancery would not have done what the Probate Judge attempted to do ; for it only *removes* guardian's "whenever sufficient cause can be shown for such purpose. In all such cases the guardianship is treated as a delegated trust for the benefit of the infant, and if it is abused or in danger of abuse, the court of chancery will interfere." 2 Story Eq. Jr., § 1339.

Third. The order of discharge was void because it was granted in a proceeding to which the appellees were not parties and of which they had no notice.

The proceeding was obviously for the benefit of the guardian only ; for its whole object was to abrogate a contract into which he had entered to take care of the persons and estates of the appellees during their minority. 2 Kent, 236 ; 1 John. Ch. R., 25.

That benefit he sought for himself, at the *immediate risk* to his wards of exchanging an efficient and faithful guardian for a faithless one, with the ultimate consequence of a loss of their entire estates.

Here was a proceeding involving benefit to the party who was pressing it to a final order ; and here was injury to parties who were denied the opportunity to be heard.

Did not the proceeding in the Probate Court involve all those circumstances which render notice of actions and suits a condition precedent to the right of a party to ask for, and to the power of the court to grant, a judgment or decree ? 2 Fla., 207 ; 14 How., 334.

The power to remove or discharge guardians being a chancery power, (2 Sto. Eq. Jr., § 1338–9 ; 2 Kent, 236–7,) must be exercised with regard to the rules and practice of courts of chancery. 21 Ala., 363.

If the Probate Judge possessed the power, it was his duty to issue process to the appellees and to appoint disinterested guardians *ad litem* to represent them. 2 Fla., 594.

Infants are as much entitled to process as adults. 2 Arch. Pr., 156 ; 1 Daniel Ch. Pr., 204 ; Tyler on In. and Cov., 203 ; 24 Miss., 154.

They must be made parties, with notice actual or constructive, to every proceeding in which their rights may be injuriously affected, as in the probate of a will of real estate, (1 Curtis C. C. R., 417 ;) the distribution of an estate, (5 Ala., 40 ;) in the appointment of a guardian, (7 Paige, 362,) and in the audit of a voucher, (39 Ala., 150 ; 43 Ala., 148 ; Thomp. Dig., 208.)

After process, they are entitled to disinterested guardians *ad litem*, specially appointed by the court, to protect their

interests. 8 Peters, 128 ; 10 Paige, 41 ; Tyler on In. and Cov., 206–7; 21 Ala., 363 ; 1 Curtis C. C. R., 417.

In one class of cases, judgments and decrees have been held irregular and *voidable at the election* of the infant, because after notice no guardians *ad litem* were appointed. 1 Am. Ld. Ca., 256 ; Tyler on In. and Cov., 204 ; 6 Dana, 87 ; 3 Marsh, 252 ; 21 Ala., 363.

By the notice, in this class of cases, the jurisdiction of the court was deemed to have attached to the person of the infant ; the want of a guardian *ad litem* was an error only and that error could be corrected by a writ of error, bill of review, or appeal.

In another class of cases, judgments and decrees against infants have been held irregular for want of notice, although the infants were represented by guardians *ad litem*. 25 Ala., 507 ; 2 Marsh, 166.

In the second class of cases, the infant being before the court by a guardian *ad litem* of the court's appointment, its jurisdiction attached to the person of the infant. Such appointment, however, being without previous notice to the infant, was an error ; but that error could have been corrected by a direct proceeding, and therefore the judgment was voidable only.

But where there has been neither notice nor the appointment of a guardian *ad litem*, the judgment or decree against an infant is void for want of jurisdiction over his person. 1 Hill (N. Y.,) 130 ; 39 Ala., 150 ; 43 Ib., 148 ; 2 Fla., 207.

Who can say that the estate of these infants might not have been saved by a word of warning from a disinterested guardian *ad litem ?* Who denied them the opportunity of having that warning uttered in their behalf ?

Fourth. The order of discharge was only in effect an acceptance of the resignation of the guardian, and therefore the unauthorized official sanction of a nugatory act.

Appellant entered into a contract by which he bound

himself during the entire minority of the appellees to take care of their persons and estate.

In entering into that contract appellant accepted "a most delicate and important trust." 1 Sto. Eq. Jr., § 317; 1 P. Wm., 105.

And he riveted that trust upon him by the acts in pais of taking possession of the appellees' estate, and converting their realty into money.

A trust thus once accepted cannot be resigned or renounced. Hill on Trustees, 327–8, (marginal 221–2); 4 Kent, 329; 2 Scho. & Lef., 220; 3 Fla., 132.

In some of the States trustees under statutory regulations may resign.

In this State the common law rule is unimpaired by legislation.

The resignation of appellant was a breach of "a most delicate and important trust," which the sanction of the Probate Judge could not legalize.

The conclusion is manifest. The act of the guardian was illegal; the action of the Judge, founded exclusively on the action of the guardian, was unauthorized; and, therefore, the joint action of Judge and guardian wrought no change in the relations and responsibilities of the former to his wards.

Fifth. The order of discharge was the result of an agreement to which the appellees were not parties.

The renunciation of appellant, his discharge, and the appointment of Bronnum, were three acts of one scheme, in which we might rationally embrace the sale of the real estate, occurring as it did only a few days before the resignation.

Essentially the transactions have a unity, and stood in contemplation of law just as though the two orders were embraced in one, with a recitation that it was made pursuant to an agreement of the parties to it.

A judgment or decree founded on an agreement binds

those only who were parties to the agreement. 2 Scho. & Lef., 220 ; 3 Mon., 296 ; 25 Ind., 458 ; 7 Cold., 191.

Even a guardian *ad litem* cannot by any prejudicial act bind an infant. 54 Ill., 231.

In Doyle vs. Blake, where executors, after intermeddling with the estate, entered into an agreement to renounce in favor of another party to the agreement, who was afterwards, upon their renunciation, appointed administrator *cum testamento annexo*, and became insolvent, Lord Redesdale held that legatees who were not parties to the agreement were not bound by the renunciation or the appointment of the administrator, and that the executors were responsible for the assets which the administrator had wasted. His Lordship said : "Now, if this agreement had been intended to bind the rights of the legatees, they ought to have been parties to it."

That the understanding in Doyle vs. Blake was evidenced by deed, and here by the admission of the party, makes no difference. The agreement was the principal thing ; the deed was in that case only evidence, and the admission is evidence in this case.

But, besides the admission, the facts of the case raise a strong presumption of such understanding and agreement. On the 1st November, 1855, appellant received the personal estate from Bronnum ; on the 27th December, 1855, he converted the realty into money ; on or about the 1st January, 1856, he resigned the guardianship ; about the same time Bronnum was appointed guardian ; and thereupon appellant returned to Bronnum not only what he had received from him on 1st November, but also the proceeds of the realty which he had converted into money on the 27th of December.

Sixth. The understanding between appellant and Bronnum, coupled with the orders of the Probate Judge, and the acts of the parties under and in connection with them, made Bronnum appellant's agent.

Such was the relation that Lord Redesdale established between the executors and Horan in Doyle vs. Blake; and he did so on facts which have their duplicates in this record.

The executors had intermeddled with the assets, and thereby fastened on themselves the trust, although they had not formally accepted it. Appellant not only formally accepted the office of guardian, but also took possession of the whole estate and converted the realty into money.

The executors had an agreement with Horan that they were to renounce, and he was to be appointed administrator. Appellant had an understanding with Bronnum that the one was to resign and the other was to procure the appointment of guardian.

The executors did renounce, and Horan was duly appointed administrator *cum test. an.* by the prerogative court. Appellant resigned and Bronnum was appointed guardian by the Probate Judge.

The executors put Horan in the possession of the estate. Appellant put Bronnum in possession not only of the original estate, but also of the proceeds of the realty.

Lord Redesdale said: " When one looks at all the circumstances of this case it is impossible to say that Horan was a man in whom great confidence ought to have been placed." Judging by the eventual conduct of Bronnum, might not the same be said of him?

The executors urged the confidence the testator had in Horan, manifested by appointing him a trustee. Appellant had no such indication of confidence on the part of the father of the appellees in Bronnum to plead for his own confidence, if any he had.

The executors pressed the consideration that they had intermeddled with the estate so far only as in their judgment was necessary to protect that part of the testator's family " which appeared to be most unprotected." In this case no one's interest except appellant's and Bronnum's seems to have been considered.

Horan wasted the estate and became insolvent, and so did Bronnum.

The legatees would have lost their legacies had they been confined to their remedy against Horan; and so will the appellees lose their estate if it must be recovered, if at all, from Bronnum.

This case involves a breach of trust, and therefore it falls within the original equity jurisdiction bestowed on the Circuit Court by the Constitutions of 1845–'68.

A Court of Chancery will interfere for the protection of the rights of infants against the acts of their guardians as trustees. 1 P. Wm., 710; 2 Kent, 227; 2 Story's Eq. Jr., § 1,339, note 1: 1 John. Ch. R., 99.

Could a clearer case than this be presented for the interference of a Court of Equity? The estate of three infants is illegally placed by their guardian in the hands of a man who wastes it; they are in consequence compelled to rely on their own labor for support at the age of sixteen; they are kept in ignorance of their rights until after one is married and the others are on the verge of manhood; they learn their rights at last, not from their guardian, but from mouldy records that had been buried for four long years; when they call on their guardian for an account of his long-concealed trust, he bids them to seek redress against the faithless bankrupt in whose hands he had placed their estate; when the law calls the guardian to account, he does not deign to explain any one of the remarkable facts that require explanation; the receipt by the guardian of the personal estate from Bronnum, and its return to him in sixty days, the conversion of the real estate into money by the guardian at a time when he must have already formed the design of resigning his trust, the payment over of the purchase money to Bronnum only a few days after it was received by the guardian, the ignorance in which the guardian permitted the wards to remain of their rights. But admitting all the facts, with all the inferences fairly deducible from them, with all the

suspicions they may excite, he relies exclusively for his de-
fence on the *ex parte* orders obtained from the Probate
Judge, when the infants were in their swaddlings, one by
himself and the other by his agent, with his concurrence.

As Lord Eldon said in Conyngham vs. Conyngham, 1
Ves., 322, "A court of justice must wink extremely hard not
to see the plaintiff's clear right."

To the objection made by the amended demurrer, that
Bronnum is not a party to the action, the answer is obvious.
If it be true, that the orders of the county court discharging
appellant and appointing Bronnum were void, it follows
logically that appellant's guardianship has been uninterrupt-
ed; that Bronnum has never stood in the relation of guar-
dian to the appellees; that appellants must account with
them for what he received as their guardian, and that Bron-
num is accountable to appellant; but appellant cannot re-
quire the appellees to make this action a means of enforcing
his rights against Bronnum.

Again; although the complaint shows that Bronnum is a
non-resident, it fails to state any of the other circumstances
required to bring the case within some one of the five classes
of cases in which a party can be made by publication. Secs.
2 and 3, Act of January 27, 1871, p. 10.

The right of the appellees to compound interest is settled
by Young vs. Kinnie, 5 Fla., 542.

WESTCOTT, J., delivered the opinion of the court.

It is insisted that the Circuit Court has not jurisdiction
of this cause; that jurisdiction has attached in the county
court, and that if any case is made, that is the proper forum
to grant relief.

This complaint was filed under the Code, and the law of
the Code must be the rule of decision to be applied to it.
Under the Code a complaint is the means through which
both the common law and chancery powers of the Circuit
Court may be invoked, and the Circuit Court is a court

having general original jurisdiction in both common law and equity causes.

In this case Simpson, as guardian of these infants, had in his control nine thousand four hundred and seventy-four dollars. Pursuant to an understanding between Bronnum and himself, he applied for and obtained an order discharging him from his guardianship, and Bronnum applied for and obtained an order appointing him guardian, and thereupon Simpson turned over to him the amount above named. Bronnum subsequently wasted the estate. Plaintiffs now seek to recover this sum of Simpson, upon the ground that these proceedings of the probate court are void; that it was not in the power of the probate court to discharge Simpson; and that if it was within its power to discharge him as guardian, its action was void as to them, they having been given no notice of the application for discharge. It is thus seen that the general question arising upon this demurrer is whether Simpson was, either in law or equity, liable for this sum; and if he was so liable, plaintiffs sought a judgment for that sum.

Is the jurisdiction of the county court adequate to the granting of such a judgment and its enforcement? The county court has no such power. Its jurisdiction, in strictly common law cases, is limited to "cases where the amount in controversy does not exceed three hundred dollars." It cannot hear and determine a suit arising out of the relation of guardian and ward, and enter a judgment or decree for the sum claimed in this action. The county court has full power to call a guardian to an account, and to exercise other powers, either surrogate or probate in their character, appertaining to the infant and his person and estate. These powers, however, do not extend to jurisdiction in an action upon a guardian's bond for a sum over three hundred dollars; nor would it have jurisdiction to enter a decree for the sum claimed in this suit.

The case presented is nothing more than a matter of ac-

counting between guardian and ward, in which the sum claimed is in excess of the ordinary civil jurisdiction of the county court, and to the recovery of which the jurisdiction of a court of equity or common law is appropriate, according to the peculiar nature of the facts, that is, whether they are legal or equitable, which constitute the basis of the claim. The Circuit Court had jurisdiction over the subject matter of this action.

The second error assigned is that the judge could not enter this order in vacation. This being one of those cases in which, prior to the Code, the Judge of the Circuit Court could have acted in vacation, he is, by the amendments of the Code, now authorized to act out of term. There is an apparent conflict between the provisions of Section 201 of the Code and Section 202, as amended, (Chap. 1,832, Sec. 7,) but this was the evident intention of the Legislature, and if any effect is given to the amendment, it must go to this extent, or have no operation at law to accomplish the effect desired by the Legislature.

Thus disposing of these preliminary questions which relate to general jurisdiction over the subject of the action, and the regularity of its exercise as to method, we reach the merits of this controversy.

Their consideration is involved in the determination of the third error assigned, which is that the judgment upon the demurrer should have been for the defendant, for the reason that the complaint does not set forth facts sufficient to constitute a cause of action.

Appellant insists, that after the appointment of Bronnum as guardian, his receipt was a discharge of Simpson's liability, while appellees maintain that the Judge of Probate could not, under the Constitution then in force, make the order removing Simpson from the guardianship; that the constitutional direction to the Legislature conferred no power upon the Legislature to vest such jurisdiction in the Judge of Probate; that no such jurisdiction was conferred by the

Legislature; that if it was, such jurisdiction was in this case exercised without notice to these infants, and is for that reason void as to them, and that the facts attending the attempted removal of the one and appointment of the other are such as render Simpson still liable for these funds.

These proceedings in the probate court were had under the Constitution of 1839, and the legislation thereunder, and it is to these we must look to determine their validity. The argument is, that the power to remove a guardian was under this Constitution an exclusive power of the court of chancery; that such was the case in England, and that such was the case here.

Under this Constitution it was provided that "the judicial power of this State, both as to matters of law and equity, shall be vested in a Supreme Court, Courts of Chancery, Circuit Courts, and Justices of the Peace," and until a separate court of chancery was orgazized, the Judges of the Circuit Courts were to exercise such chancery jurisdiction. Following the general distribution of judicial power, Section 9 of the same article directed that "the General Assembly shall provide by law for the appointment in each county of an officer to take probate of wills, to grant letters testamentary, of administration and guardianship, to attend to the settlement of estates of decedents and of minors, and to discharge the duties usually appertaining to courts of ordinary, subject to the direction and supervision of the courts of chancery as may be provided by law." These clauses must be construed together, with reference to the manifest purpose of the Legislature, and that purpose must be determined by the nature of the changes which they worked in the antecedent system, and the objects which they intended to accomplish. We cannot accept the argument that because the power to remove was an exclusive chancery power in England, that such was the case here under the American system, a system in which many of the powers belonging exclusively to courts of chancery in England are here confi-

ded to other courts. The constitution in express terms directs that this officer shall have jurisdiction in the matter of appointing guardians and the settlement of the estates of minors. Under the English system, the settlement of the estate, as far as its management was concerned, and the appointment of a general guardian, were exclusive chancery powers, and even there the chancellor does not attempt to deal with the inheritance of infants without the aid of an act of parliament. 1 Malloy, 525 ; 6 Beav., 97. There was in England no such thing as a distinct surrogate's court or court of ordinary, or of probate, and what were called county courts, while their jurisdiction, before the courts at Westminster were erected, was very extensive, yet they have had no such powers since that time, if they did before ; and while the ecclesiastical courts have since that time exercised some of the powers which in this country belong to the jurisdiction of what in American law are called courts of ordinary, surrogate's courts, or probate courts, such as taking proof of wills, granting letters testamentary and of administration, &c., still they had not in the matter of guardianship any power beyond the appointment of a guardian *ad litem*, a power incident to any jurisdiction where an infant's interest can become the subject of judicial investigation. The books disclose but one case in which such power was exercised by them. In that case, Lord Hardwicke reprobated it as a presumption in the ecclesiastical court to appoint a guardian of the person and estate, declared their appointment of such guardian to be an interference with his power as chancellor, and recommended the Attorney-General to resort to a *quo warranto* to try the question. We thus see that the power to appoint a general guardian of the person and estate belonged exclusively to the chancellor in England. The power *to settle the estates of minors* was equally a chancery power, and it must be noted that this is a greater power than the power *to settle* the account *of a guardian*, from which appellees insist no power to remove him can be implied, but of

this we say more hereafter. We thus see that every power directed to be granted by the Constitution as to the matter of guardianship, was an exclusive chancery power in England, and that there was no court in the English system corresponding in its functions and relative powers to the courts of ordinary or of probate in the United States.

What powers followed the grant embraced in the words, "and to discharge the duties usually appertaining to courts of ordinary," so far as concerned the matter of guardianship? These powers, it is evident, must be ascertained by reference to the powers of such courts in the United States, as there was no such court as a *court of ordinary* known to the English system. The term, ordinary, there signified every official of the bishop or other ecclesiastical judge having official power, and at common law it signified him who hath ordinary or immediate jurisdiction in causes ecclesiastical. There are comparatively but few courts known as courts of ordinary in the United States. We have examined the laws of all the States within our reach. We find but one State in which there is a " court of ordinary." We find ten in which there are " courts of probate," two in which there are " orphans' courts," three in which there are " county courts," one in which there is a court of " common pleas." The term, " courts of ordinary," in the Constitution, cannot be interpreted with reference exclusively to courts of that particular name. If, however, such was the case, the power to remove a guardian, to revoke his appointment, is possessed by that court. These words indicate " a class of duties which the Constitution provided should be imposed by the Legislature on the officer designated, these duties to be of a like character with those imposed by other States " upon the courts which, in their several systems, had the power of appointing guardians and the general supervision of their accounts. This officer was not only to be invested with the general and particular powers named in the Constitution, but the Legislature was to impose such duties as usually ap-

pertained to those courts in other States which occupied in their system the same relative position which the probate court was to have in ours. And, in the matter of guardianship, it made no difference whether these powers were such as belonged exclusively to the court of chancery in England. All general power over the guardian in England being of that character, such a construction would deny a chancery power, notwithstanding it was a power usually appertaining to courts of ordinary and would exclude every other power, except that of appointment and settlement of accounts. This is not a proper construction, as the Constitution expressly directed that the Legislature should impose the duties usually performed by such courts without any such exception. These differences, in the American and English systems, are fundamental in their character, and the clear inference is, that those who made them intended great changes. These changes, too, are not restricted alone to the matter of jurisdiction, but extend also to the method of its exercise. Under the English system, the chancellor had a general discretion and control, and the guardian was not bound by any statute or act of parliament to render his accounts at stated periods, while here, fixed periods were indicated for his accounting. Again, all the powers which the Legislature was to confer were to be powers, in the exercise of which this officer was to be subject to the direction and supervision of the court of chancery, and a court of chancery could not perform a more appropriate function than supervise an inferior officer invested with powers of a like description as those possessed by itself; while it would be an inappropriate function to supervise the exercise of powers of a different character. It would be an anomaly for a court of chancery to supervise or direct a court exercising common law powers. Indeed, if such authority was given to it, it would cease to be a court confined to chancery jurisdiction, and become court exercising powers of each character, and thus strictly both a court of chancery and common law. The fact that the re-

moval from the place of guardian was in England a power confided alone to the chancellor, is not a reason why such a power might not, in perfect accordance with the Constitution, be invested by the Legislature in this officer. The verse, we think, is the proper view. The framers of this Constitution expected, directed and intended that the Legislature should by law give this officer *just such powers*, to be exercised under the general control of the chancellor. This officer was to be an aid and auxiliary to that court, and, in the matter of guardianship, was to be invested with such power as would enable him to control the guardian and protect the estate.

Is the power to remove or displace a guardian of like character with the powers conferred by other States on their courts of ordinary, or is it a particular power following the grant of authority to settle the estate of the infant? We have exhausted the material for examination at our command, and without a single exception these courts have the power to remove or displace a guardian from his office or place before its termination, according to the letter of his appointment. In many of the States, they have control over them similar to that exercised by the court of chancery in England, and sometimes the jurisdiction is exclusive. Cooley's Black., § 463, note 10. (1.)

---

(1) *Maine*—The Judge of Probate may "dismiss" at his discretion or upon request of guardian.

*New Hampshire*—The Judge of Probate "removes" whenever he thinks it necessary or expedient.

*Connecticut*—The J. P. appoints and may remove for good and sufficient cause.

*Rhode Island*—The J. P. appoints and has general power of removal.

*Vermont*—The J. P. has general power to remove and may accept resignation.

*New Jersey*—General power of removal belonged to Orphans' Court.

*Maryland*—Particular power of removal belonged to Orphans' Court.

*Georgia*—Court of Ordinary appointed and might dismiss.

*Indiana*—Court of Common Pleas appointed and had particular powers of removal.

While the causes for which this revocation of appointment and displacement from his position are various, in some States the power being general, in others limited to particular circumstances, still the power belongs to the class which usually appertains to courts of ordinary in the United States, and for this reason we conclude that the Constitution does justify the investiture of such authority by the Legislature. We deem it unnecessary to say anything as to the power to settle the estates of infants, in view of this conclusion, as it disposes of the point.

We next inquire, has this power of revocation of appointment and displacement been conferred by the Legislature?

In accordance with the direction of the Constitution, the Legislature, at its first session, passed "an act to organize the courts of probate for the State of Florida." After fixing the method of appointment and the term of office of the officer, it was enacted that it should be his "duty to take probate of wills, to grant letters testamentary, of administration and guardianship, to attend to the settlement of estates of deceased persons, and of minors, and to discharge the duties usually pertaining to courts of ordinary; and an appeal shall lie from any final order or decision of the said Judge of Probate to the Circuit Court of the proper county in like manner as the same is now authorized from the decisions of the County Courts to the Superior Courts."

*Tennessee*—County Court might appoint and might remove in some cases. Guardian might resign.

*Kentucky*—County Court might appoint and remove. Guardian might resign.

*Alabama*—J. P. might appoint; might remove for cause.

*Mississippi*—J. P. might appoint and "displace."

*Arkansas*—J. P. appointed and might remove for good cause.

*Iowa*—County Court appointed and might remove for cause.

*Michigan*—J. P. appointed; could remove for cause. Guardian might resign.

*Minnesota*—J. P. appointed; could remove for cause. Guardian might resign.

The  act  further  provided " that  the  Judges  of  Probate
hereby. authorized  to  be  appointed, shall  have  all  the  pow-
ers  and  shall  perform  all  the  duties  heretofore  prescribed  by
law  as  the powers  and  duties  of  Judges  of  the  County  Courts,
when  acting  as  courts  of  ordinary."

It  further  provided " that  every  Judge  of  Probate  shall
record  in  a  book  or  books, to  be  kept  for  that  purpose, dis-
tinct  and  at  full  length  all  wills, testaments  and  codicils
proved  before  him, and  the  proof  thereof, all  letters  testa-
mentary  and  of  administration, all  accounts  of  executors  and
administrators  settled  before  him, all  orders  and  decrees
made  by  him  in  relation  to  such  estates, the  appointment  of
guardians  and  the  revocation  of  such  appointment, the  ac-
counts  rendered  by  guardians  and  settled  by  him, orders
and  decrees  for  the  sale  of  minors' real  estate, all  orders  and
decrees  for  the  assignment  or  admeasurement  of  dower, and
all  other  orders  and  decrees."

Under  the  legislation  conferring  powers  upon  the  county
courts, it  was  provided  that " the  county  courts  shall  hear
and  determine  all  complaints  of  wards  against  guardians,
require  of  them  counter  security, when  necessary, displace
them, or  make  such  orders  as  to  them  may  seem  equitable.
and  right  relating  to  the  estate." Sec. 1  of  Act  Nov. 20,
1828, Duval, 168.

The  8th  section  of  an  act  approved  February  17, 1833,
Duval, 276, provided " that  the  Judge  of  each  County  Court
shall  have  power  either  in  open  court  or  in  vacation  to  take
the  probate  of  wills, grant  and  revoke  letters  testamentary
and  letters  of  administration, appoint  and  displace  guardians
of  infants, orphans, idiots, lunatics  and  persons  *non  compos
mentis."            *            *            *            *            *            *

Section  50  of  the  act  of  November  20, 1828, enacted, pro-
vides " that  the  Judges  of  the  several  County  Courts  of  this
territory  shall  have  power  to  take  cognizance  of  all  matters
concerning  orphans  and  their  estates, and  to  appoint  guar-
dians  in  cases  where  it  appears  necessary  and  proper, and

shall take good security of all guardians appointed by them for the estate of orphans committed to them."    *    *

Under these statutes the Judge of Probate was invested with a very extensive jurisdiction. We have already seen that the power to remove or displace a guardian is such a power as usually appertains to courts of ordinary in the sense that these words are used in the Constitution, and the same is true of the power conferred by these words in the act of the Legislature organizing the probate court. Under the first section of the act of November 20, 1828, it is made his duty to hear and determine all complaints of wards. He is invested with the general power to require of them counter security whenever he deems it necessary, and he has the general power to displace them, as well as to make such orders relating to the estate as to him may seem equitable and just. It was insisted in the argument that the effect of this section was to restrict this power of displacement to those cases only in which the ward complains of the guardian. It was not the purpose of the Legislature thus to restrict the court. Such a restriction would be inconsistent with the general tenor of the whole of this legislation. The infant is, by law, deemed incapable of attending to his own concerns, and it would be strange indeed if the power of the court, which has charge of his interests, could be invoked in this important matter only when one legally deemed incapable of attending to his own concerns should call for the exercise of such protection. The guardian of an infant occupies a position of power and control, both as to his person and estate, and it is against this power and influence that the infant needs protection. Strange indeed would be that law which, while it deemed one incapable of protecting himself and placed him in the control of another, still restricted the power of a court to which his general interest was confided, in extending this protection against such power to those cases only in which this incompetent person should act. The proper grammatical construction of this section vests a gene-

ral power to displace, and such power is entirely consistent with the general policy of the legislation upon the subject. Section 50 of the same act invests the Judge of Probate with power to take cognizance of all matters concerning orphans and their estates, and to appoint guardians. The 8th section of the act of February 17, 1833, invests him, in general terms, without any restriction, with the power to appoint and displace guardians of infants. The Legislature, deeming it essential that this officer should preserve a record of his acts under these powers, required of him to make a record of all appointments of guardians, and the revocation of such appointments, thus showing that the Legislature conceived that he had the power, under this legislation, to revoke such appointment. It should be a plain case to justify us in giving a construction to a statute inconsistent with the clear legislative interpretation of its own action.

A brief examination of the cases cited from New York will show the very great difference between those cases and this. Under the Constitution of New York, no power was conferred upon a surrogate. The Legislature was not directed to invest any officer with powers of the nature mentioned in the Constitution of Florida, and the chancery jurisdiction was invested in other courts under the letter of the organic law. Under the legislation of that State, there was no general grant of power, from which this power to revoke an appointment of guardian could be implied or result. His jurisdiction to remove was restricted by the Legislature in this language : " On the application of any ward, or of any relation in his behalf, or of the surety of a guardian, to the surrogate who appointed any guardian, complaining of the incompetency of such guardian, or of his wasting the real or personal estate of his ward, or of any misconduct in relation to his duties as guardian, the surrogate, upon being satisfied by proof of the probable truth of such complaint, shall issue a citation to such guardian." The act further provides that if, upon the trial, he is satisfied of the incompetency or mis-

conduct of such guardian, he may, by an order, remove the guardian from his trust, and, upon such removal being made, the surrogate may proceed and appoint a new guardian. Chancellor Kent held that under this statute the surrogate had no general jurisdiction over a guardian appointed by him as trustee, that power remaining in the court of chancery. (1 John., 99.) So Chancellor Walworth held, (5 Paige, 536,) that this statute gave jurisdiction to a surrogate to remove a guardian appointed by him, (the surrogate,) for incompetency or misconduct, but he had no jurisdiction to remove a guardian appointed by the court of chancery, or to compel him to account either before or after such removal.

This was the point involved. In his opinion, however, the chancellor went further and remarked : " The surrogate has no authority to call any guardian to account, or to discharge or remove a guardian, except in the particular cases specified in the statute, the surrogate, in this respect, taking no incidental power or constructive authority by implication which is not expressly given by statute." Looking to the New York statute, it is apparent that no other conclusion could have been reached. Looking to the Constitution and statutes of New York and Florida, it is equally apparent that the powers conferred upon the surrogate in the one State and the Judge of Probate in the other, are not at all similar, and that the cases in New York are not authorities by which to measure the power of the Judge of Probate in Florida.

The probate court having the power to revoke the appointment of Simpson, and thus displace him from the place of guardian, the next question presented for our consideration is, was it necessary to the validity of this order that the wards should have been given notice ? It is insisted that they were entitled to notice upon the broad ground that such an order was one affecting their rights.

It is unquestionably true, as a general proposition, that no person can be deprived of his life, liberty, or property,

without due process of law, and also that this involves notice. It is, however, clearly settled that no ward has a right to a particular guardian, and that guardianship is an office or place under the sole and exclusive charge of the courts having jurisdiction over the general subject of the custody of infants. The chancellor or court having general power of revocation, is entrusted with the management of the estate, subject to such regulations as are prescribed by law. In England the jurisdiction, so far as the appointment was concerned, was exercised in a summary manner upon petition, and there are cases in the United States holding expressly that it is no objection to the validity of an appointment that the infant was not made a party. (33 Ala. 221; 1 Ala. 388; 2 Doug. 434; 1 Hay. 303; 39 Ala. 150; 7 M. and W. 409; 7 Ves., Jr., 348, 381.) The matter of the appointment of a guardian certainly affects the interest of the infant as much as the removal. The case from 1 John. Ch'y, cited by appellee, sustains this view as to the power of removal. There the ward had arrived at the age of fourteen, and sought to remove the guardian. Chancellor Kent said: "This court has the care and protection of infants during their minority, and they have not, nor ought to have, any such power in regard to guardians appointed by this court." See also 1 Murphy, 227. It is the practice in many of the States for this action to be taken at the instance of some relative of the infant. Baron Alderson, in the case above cited, says, that "in all cases where a party cannot sue for himself, the court employs a *prochein ami* as its officer to conduct the suit for him, and no appointment or subsequent confirmation by the party is necessary. It is in fact almost the same thing as appointing an attorney; the law, if we may so speak, appoints an attorney to act in behalf of the infant." As a matter of course, there is, in many respects, a difference between the powers and duties of a *prochein ami* and that of a general guardian, and the case is not precisely this case. The general guardian, as well as

the *prochein ami*, are, however, both officers of the court, and the infant has, as against the power and discretion of the chancellor, no more power in the one case than in the other. . In the case of Ripton vs. Hall, 1 Stewart, 166, the complaint was filed by a person other than the infant, and the guardian was removed. The court remark, " as the statute prescribes no particular mode of proceeding, (and that is the case in Florida,) nothing more is necessary to appear of record than that the court had jurisdiction of the subject matter of the controversy, that the guardian had an opportunity of being heard, and has been removed for good and sufficient cause." The power of removal there was limited to cases where good and sufficient cause was shown, and this case was heard upon appeal. It is insisted also that the exercise of the power of removal or displacement here was not in conformity with the rule prevailing in a court of chancery, that the guardian was removed without cause, and as it were upon his mere resignation. We do not say that there was any error here, but if there was, the Judge of Probate, having this power and jurisdiction of the subject matter, an erroneous exercise of it cannot be reviewed and corrected in this collateral manner. The case of Young *et al.* vs. Lorrain *et al.*, 11 Ill., 633, is a case precisely in point. This principle is so well recognized that it is unnecessary to say more in reference to it.

There remains but one more point to be disposed of in this case, and that is whether, under the facts set up in the complaint, the transfer of the moneys by Simpson to Bronnum relieved Simpson from any further liability.

The plaintiffs in their complaint allege that on or about the first day of January, 1856, pursuant to an understanding between the defendant and the said Bronnum, the defendant applied for and obtained an order from the probate court of said county discharging him from his said guardianship, and the said Bronnum applied for and obtained an order appointing him guardian of the persons and the estates

of the said Emelia J., Eric and Richard C., and thereupon the defendant turned over to the said Bronnum all the assets in his possession, or under his control, belonging to his said wards, including the proceeds of their real estate, which the defendant had converted into money as aforesaid, amounting in the aggregate to $9,424.87. The plaintiffs further allege that the said Bronnum has utterly wasted and spent the entire estate, and that the sureties upon his bond, as well as himself, are insolvent.

There is no allegation that Simpson, the removed guardian, was in any way connected with the subsequent wasting of the estate by Bronnum. There is no allegation that Simpson had any reason to believe even that Bronnum was not entirely trustworthy at the time of the change. As to the naked understanding and agreement between these parties, in the absence of an allegation of facts showing it to have been fraudulent, we cannot presume that such was the case, and therefore no case of fraud is here presented for our consideration. If there was nothing more than understanding, we cannot see the least impropriety in that. We think rather it is highly commendable in a guardian to continue in the discharge of his trust until he can find some suitable person to whom it can be transferred. Such would be the course of any guardian who felt much interest in his ward, in the future of the infants entrusted to his care. The court itself might refuse a revocation of appointment until the name of some good person was suggested. Upon the revocation of the appointment of Simpson, his power as guardian for the future ceased. It was a matter of course to require him to account and to pay over to his successor the balance. (10 Paige, 316.) Having done this, he was relieved from any further responsibility. There is a great difference between this case and the case of Doyle vs. Blake, so much relied upon by appellee. The executors there had acted; had each intermeddled with the assets. The administration to Horan was void. (Levinz, 182.) Their transfer-

ring the assets to him was the same as if they had transferred them to an individual. In the present case Simpson was displaced from his guardianship by a court having that power. The simple revocation of his appointment, his removal, did not release him from any liability for past acts. When he ceased to be guardian, he was no longer entitled to the custody of the assets. The court then appointed Bronnum. That appointment was not void like Horan's, but was effective and legal. He became legally entitled to the custody and control of the estate of the ward, and his reception of the funds relieved Simpson of all liability for the loss which occurred by the subsequent wasting of the estate by Bronnum, and the insolvency of Bronnum and his sureties.

The judgment is reversed, and the case will be remanded for further proceedings not inconsistent with this opinion, and conformable to law.