Mr. Justice "Westcott
delivered the opinion of the •court.
This is a suit in equity by a ward, Chester P. Knapp, after attaining his majority, against his guardian, Hamp-son, and the sureties upon the guardian’s bond, Pfeiffer and Sullivan. The plaintiff, in his bill, alleges the receipt of named sums of money by the guardian from the executor of the will of his father, a failure upon the part of his guardian to make any account of his trust, and his failure to pay the sums due plaintiff from his father’s estate so received by him.
After admitting the receipt of small sums from his guardian, he prays an account and for a decree for the sum to be found due against the guardian and his sureties, Pfeif-fer and Sullivan.
To the original bill the Governor of the State of Florida was a party plaintiff.
To this bill the defendants interposed a demurrer.
The grounds urged in its support were:
First. That the Governor of Florida is improperly joined as a party complainant.
Second. That the defendants, the sureties, are improperly joined as parties defendant.
Third. That the County Court has full jurisdiction in the premises.
Fourth. That the plaintiff Knapp has a complete remedy at law.
There was joinder in demurrer, hearing and judgment overruling the demurrer, upon plaintiff’s striking out ’ the • “Governor of the State of Florida” as a party, with leave to defendants to answer. The amendment being made, defendants answered.
There is no question made in argument by appellants as to the propriety of this ruling of the court upon the demurrer. There can be no question, however, as to the propriety of joining the guardian and his sureties as defendants to a bill for an account and decree, in this State; nor is there any doubt as to the jurisdiction o'f the court of equity in the premises. 8 Fla., 77, 153; 3 Black., 141-2; 2 Story’s Eq., 585;15 Fla., 38.
Defendant Hampson filed no answer.
The other defendants, in their answer, admit the appointment of Hampson as guardian, and his and their execution of the bond. They neither admit nor deny the receipt of the moneys by the guardian, and-demand proof of the same. They state upon information and belief that a portion of the money received, by Hampson “was not the personal estate of said, complainant, but .was the distributive portion of the proceeds of certain real estate belonging to the estate of C. P. Knapp, deceased, the father of complainant, and that the same was not rightfully paid to the said Hamp-son as general guardian, and that his guardianship bond is not liable for the same.”
Upon information and belief defendants further say, that. Hampson, a short time after his ward reached his majority, did render him an account, that the .amount due him was ascertained, and that complainant, without their knowledge' agreed- to allow the amount due him to remain in Hampson’s hands, with an agreement that Hampson should invest the amount due complainant in a farm in Texas ; that, complainant agreed to accompany Hampson to Texas and enter into a copartnership in farming, and that the money was so invested in pursuance of ■ said agreement; that the said complainant went with the said Hampson to Texas in pursuance of said agreement, remained with him for several months and .made no'demand for his'money until he became dissatisfied with the copartnership agreement ; that the guardian has paid several large sums of money for and on .account of his ward; that by agreement with Hampson to take an interest in the land to be purchased in Texas, the complainant allowed Hampson to remove himself and his property from the State of Florida without accounting to the Probate Court and beyond its jurisdiction, binding himself by such agreement not to call the said Hampson to account before the said Probate Court; that Hampson at the time the complainant arrived at his majority was solvent, and abundantly able to pay the amount, if any, in his hands as guardian, and that he would have paid the same had complainant called upon him to do so, but that complainant suffered the same to remain in his hands and entered into an agreement with him, by virtue of which the said sum was invested in lands in the State of Texas for the benefit of complainant; that thereby the rights of defendants were prejudiced, and they were discharged from all obligation or liability upon the said bond.
There was an order taking the bill as confessed against Hampson, and an order of reference to a master to take an account of the moneys due in respect of the guardianship, to compound interest, if the testimony warranted it, to take deposition of witnesses as to the defences made, and to report.
It is unnecessary to state in detail the interrogatories addressed to the witnesses and their answers. The testimony is substantially as follows:
The defendant Hampson, the guardian, admits his appointment as guardian about May 30, 1872, and acknowledges that on August 1, 1872, he received certain sums of money from B. D. Wright, the executor of the will of complainant’s father. The complainant being examined, admitted the receipt of certain sums from his guardian. Hampson, the guardiad, further testifies, that of the sums received by him from the executor, $1,309.64 was not received in money; that at an executor’s sale on the 26th of December, A. D. 1870, he bought the homestead for $2,220; that he paid no cash; that amount was the portion of the estate coming to his wife as.daughter of the testator and to the complainant; that no ,deed was made at that time, but that a deed was made to .him on the 22d of August, 1872, that he occupied.the house soon after the sale of 1870, and considered that he owned it, so far as his wife had an interest, and that he considered that the property was “deeded to him” by virtue of the purchase of 1870; and that at the time of the deed of August, 1872, he gave a receipt to the executor for $1,309.64, as the guardian of the complainant, that being the ,sum representing complainant’s interest in the amount due on the purchase. A copy of the order of the Judge of Probate authorizing the sale of the homestead, as well as a copy of the deed made by the executoj to Hampson, is in the record. The order authorizing the sale recites that a petition was the basis of the proceeding, but no copy of a petition is in this record.
The guardian, when asked whether he had an agreement with complainant that he should invest, this money as guardian in a farm in Texas and go into partnership, says* “ye had no agreement; we had conversations about it before.going out there; I was to wait out there for him to come out and see how it- suited him, when he would decide about the partnership; I invested money in Texas sometime in April, 1874, on my own responsibility; after I bought the place in Texas I thought I would still have money enough to settle up with him; after I had made the investment the complainant sent me a telegram; I think it is the one offered in evidence; I enclosed it in a letter to R. L. Campbell on Feb-, ruary 19, 1876; I sent money to complainant in. response to the telegram; he went to Texas with my family; I removed my family to Texas in May, 1874, having sold my property in Pensacola before leaving; the sale of my property in Pensacola and my investment in Texas was not in *44 consequence of an understanding with complainant that his money should be invested there; I had no agreement with him as to my going to Texas; we had conversations about it, but no agreement; I paid $500 for the farm, and had $2,200 left, believing that I had enough to pay him; the .house cost me more than I expected, and I soon found that I had invested all my money; shortly after complainant’s arrival in Texas he and I had a misunderstanding, and he never spoke to me about .the farm; the farm was bought in my own name; I never conveyed or offered to convey any interest in it to complainant; he was in Texas about •ten days or two weeks.”
The complainant sworn says: “I became of age 22d of March, 1874; I was in Alabama; had been there about a year; I returned from Alabama sometime in March or April of that year; Hampson was at the time in Texas; after my return I did not see him until I went to Texas with his family; I never wrote to him agreeing to go into partnership with him in a farm in Texas; from the time .that I went to Alabama to the time that I wont to Texas, I met him but once, at the junction; I was not then of age; the conversation of which he speaks occurred before I went to Alabama; he spoke of going to different places ; I wanted the money that I telegraphed for to settle my debts here before I left; about a week after I got to Texas I asked Mr. Hampson for a settlement; he offered to give me his note; I did not accept it, but left as soon as I could get my trunk ready; I did not say a word about a partnership while in Texas; the words ‘in farm’ I do not think were in the telegram I sent; I could swear that they were not; I did not mean by it that I would go into partnership with him; Hampson invested the money without my consent.”
O. M. Avery, the Judge of Probate of Escambia county, swears: “I find in my office an account stating the amounts due to the heirs as well as creditors of the estate, showing a balance still in the hands of the executor • of $380.70, which lie is ordered to pay to the heirs according to their distributive shares, dated May 21, 1873, also a final account. I find no special order directing the executor to pay over any amount of money to T. Jeff. Hampson as guardian of Chester P. Knapp. I find in the account the amount of $1,309.64 charged and purporting to have been paid by B. D. Wright to T. Jeff. Hampson, as guardian of Chester P. Knapp ”
A copy of the receipt in evidence is as follows:
Received, Pensacola, August 1st, 1$72, from Benj. I). Wright, as executor of the last will and testament'of Chester P. Knapp, deceased, thirteen hundred and nine dollars and sixty-four cents, on account of the distributive share of Chester P. Knapp, Jr., in the estate of the said Chester P. Knapp, deceased.
T. Jéfp. Hampson,
G-uardian of C. P. Knapp, Jr.
There is also a.like receipt dated May 23, 1873, for $82.67, “being in full settlement of Chester P. Knapp, Jr.’s, one fourth distributive share.”
The telegram in evidence is as follows:
Pensacola, Ha., April 27, 1874.
Oapt. J. Ilampson:
Send three hundred twenty five dollars. Will, go in. with you in farm.
Chester P. Knapp.
(Endorsed) — “Sent money to-day. Come on immediately.”
There is in the record a copy of a conditional order of final discharge of the executor, and the executor in -his accounts, credited himself with the amount of the receipts of Hampson, the guardian. The following letter of the guardian to one of the defendants is in the record:
“McKinney, Texas, July 15, 1875.

Mr. H&nry Pfeifer:

Dear Sir: — Yours dated June 30 is at hand and contents noted, and in answer would say that I was not aware of the fact that Chester Knapp had been trying to obtain money from you, as he had promised to wait on me until I could pay him, and I had no idea he would attempt to give you any trouble whatever. I am very sorry, indeed, Mr. Pfeiffer, that the matter has, or will cause you any trouble or expense} but rest assured that you or Mr. Sullivan shall not be out a dollar in the transaction. It was more to please Chester than myself that I bought this farm. He requested me to invest his money in land and he would stay with me and we would work the farm together, which if’ he had done, we would have made it pay very well. But he found that hard work did not agree with him and he hauled off and suddenly came to the conclusion that he did not like farming, and then he wanted me to give him the balance of the money that he claimed was due him, knowing at the time that I could not do so, as all of our. money was invested in the farm. Times are very hard he^e and money scarce or I might raise the required amount by mortgaging my farm, but it would be impossible to do that now as money is not to be had at any rate of interest. I lost a groat deal when my house and furniture was burnt up, and the drouth, in connection with the chintz bugs and grasshoppers, has ruined my .crop. Had it not been for them I would have made a thousand dollars on my crop, but as it is now I will come out in debt instead. So you see just how I am situated. I would have answered this ere this, but your- letter laid in the office some time before I received it. Hoping we can fix up this affair ’without much trouble to you,
I remain,, respectfully yours, J. Hampson.”
There was a master’s report and consequent decree against the guardian and his sureties. Prom this decree this appeal is taken. The ground upon which a reversal is sought is that the “court erred in rendering a decree against appellants,- the sureties, on the guardianship bond.”
There are strictly two general questions in this case:
Pirst. Was the guardian properly chargeable with the moneys for which a decree is sought ?
Second. If he was chargeable with these sums, has the complainant, the ward, so acted as to excuse his sureties from payment?
As to the first question:
The facts appearing from this testimony are that Hamp-son was appointed guardian of the complainant on the 30th of May, 1872, that lie gave bond on that day with defendants Pfeiffer and Sullivan as sureties, conditioned that he should well and truly discharge his duties as guardian, keep all the property of his said ward, the same pay over and deliver when legally required so to do, and should make and render true and correct account of his guardianship in the form and manner prescribed, or that might thereafter be prescribed by law.
On the 26th of December, A. D. 1870, at an executor’s sale of certain real estate, Hampson bid it in, but no deed was’ at that time made to him. Subsequently and .after lie had undertaken the trust of guardian of complainant, and after the execution of the bond, and on the 1st day of August, A. D. 1872, he receipted to the executor for the share of the proceeds of the sale coming to his ward, the executor took credit for the sum so receipted for in his account, charging them to Hampson as guardian, -and executed to Hampson a deed for the property.
*45 The first question arising in this connection is, was 'the principal, Hampson, properly chargeable with this sum in his accounts as guardian, and are his sureties accountable for its due payment and administration by him. So far as the answer is concerned, it neither admits nor denies the receipt of the moneys as alleged by plaintiff. Defendants simply demand proof of such receipt, alleging that a portion of the moneys received by Hampson was not the personal estate of said complainant, but was the distributive portion of the proceeds of certain, jeal estate belonging to the estate of C. P. Knapp, and that tlie same was not rightfully paid to the said Hampson, as general guardian, and -that his guardinship bond is not liable. There can be no doubt that the guardian of an infant is the proper person to whom to pay the distributive portion of the proceeds of the sale of the real estate of the deceased testator. It is property of the infant, covered by the bond, which the guardian is entitled to receive, and for which he must account. In this case the payment is approved by the court, the court having granted a discharge where the executor entered a credit in his accounts, and if there is not some substantial legal objection, arising from the fact that there was not an actual change of money between the executor and the guardian, then the guardian was properly chargeable and the sureties are responsible for the due performance of his trust in respect thereto. ( 1 John Chy., 3; 106 Mass., 586; 9 Vmt., 41; 3 Pick., 213; 2 Wms. Extrs., 1,405, 7th Ed.; 2 McCord, 55.)
There being nothing in the nature of the property to exempt the guardian from liability, the next question is, was the simple receipting for the money without its actual receipt, first by the executor and again by the guardian, sufficient to charge the guardian. There is here no charge of fraud upon the part of ar one, and the only objection that can be urged is simply that there was no actual transfer of money. The fesult of the transaction here was that Hampson became indebted to himself as guardian for the amount of the distributive share coming to his ward. In the case of Moore and Montford, Extrs. vs. Felkel and wife et at., 7 Fla., 75, we have presented the case of a party occupying two relations, that of administrator and guardian. There was no actual transfer of funds to the guardian, and in treating of the subject and in disposing of the case, this court there said that the party’s “account as administrator, and the balance against him as such, forms the extent of his liability, and all his liability to his ward.”
This court then remark: ‘Tn reference to all this we find the law laid down to this effect: ‘A. was appointed the guardian of Mrs. W., when she was an infant, and the necessary consequence of this was that the amount in his hands to which she was entitled as distributee of her mother, became so much held in trust for her as her guardian.’ ” There was here no actual receipt as guardian, but the court charged him with the balance in his hands as executor. (See also 2 Fla., 327.) In speaking of a like subject, Chancellor Harper, for the Court of Appeals of South Carolina, (1 McMullen, 497,) says, “I suppose, if an administrator have in his hands the balance of an estate and is afterwards appointed the guardian of infants entitled to the estate, he will be chargeable as guardian, and the sureties to his guardianship bond will be liable. Or if'in any Other capacity he be indebted to himself as guardian, beinguna-ble to sue himself, the debt shall be presumed to be paid, and he and his sureties will be liable(See also 1 Bail. Eq., 338; 2 Ibid., 203; 44 Md., 504; Thomp. Dig., 201, §6.
There is here, so far as we can see, no escape from the conclusion that for this debt of Hampson to himself ú¡> guardian the sureties upon his bond are responsible. Tne act of receipting to the executor for the sum due his ward was an act as guardian, and his appropriation of his own debt and the failure to pay sums due by himself was a conversion, an appropriation, a breach of trust, for which his sureties were responsible, unless the ward has done something to release them. This is the only remaining defense interposed by the answer.
It is unnecessary to reiterate here at length the testimony. The claim made by the sureties is that complainant, after arriving at his majority, entered into a co-partnership with his guardian and that by his, the ward’s instructions, the money received by him, the guardian, was invested in a farm in Texas.
The testimony relating to this subject is substantially as follows:
The guardian testifies we had no agreement; we had conversations about investments of money in land before going out to Texas; I was to wait out there for him, when he would decide about the partnership; I invested money in Texas sometime in April, 1874, on my own responsibility; the saie'"’of my properly in Pensacola and my investment in Texas was not in consequence of an understanding with" complainant that his money should be invested there.
The complainant states that he became of age the 22nd March, 1874; that the conversations of which his guardian speaks as to an investment of money in land in Texas occurred when he was a minor; that he had been in Alabama sometime before‘his guardian removed to Texas;' •that in March or April, 1874, he returned to Pensacola; that his guardian had gone to Texas; that he never wrote to him agreeing to go into partnership with him in a farm in Texas; that he went to Texas with his guardian’s family; that he said nothing about any partnership while there; that about a week after he got to Texas he asked his guardian for a settlement; that Hampson offered him his note; that he did not accept it but left as soon as he could get his trunk ready.
So far as this testimony is concerned, it certainly does not establish the defense insisted on by defendants. On the contrary, nothing beyond conversations between guardian and ward, during the minority of the ward, as to investment in land in Texas is established. At the time that the guardian removed to Texas the ward was in another State and was a minor.
As to the telegram of the ward and the letter of the guardian to Mr. Pfeiffer. Independent of any questions as to the admissibility of either as evidence as they were presented, we cannot see, considered with reference to the other positive testimony under oath, that they establish the defense, and the burden of proof as to this matter was upon the defendants. It may be admitted that such a telegram was sent, or that such proposition as it contains was made to the guardian after he went to Texas, and it does not make a case for the defense.
The testimony of each witness, giving it its most liberal construction, is to the effect that nothing more than a. proposition was made. Ho terms were agreed upon, no transfer of any interest had, and nothing in the shape of a settlement transpired. The letter is from the guardian to one of his sureties. The ward is in no way connected with it. In this letter the guardian states to the surety that the ward had promised to wait on him until he could pay him; that he bought the farm more to please his ward than himself; that he requested him to invest the money in land and work the farm together, but that he, .the ward, “hauled off and suddenly came to the conclusion that he did not like farming, and then -he wanted the balance of the money.” Looking to the testimony of this witness, it is evident that the minor’s request to invest the money in land was made during his minority. If it be not so, then this witness *46 swears falsely as to what happened' upon the ward’s visit to Texas, for his statement as to what then happened is inconsistent with it. He says in his testimony that Chester (the plaintiff) did not consent to go in with him in the farm after he got to Texas. “He and I had a misunderstanding shortly after his arrival, and he never spoke to me about it that T remember.” He writes in the letter that the ward wanted the balance of the money, and from the letter, which bears date July 15, 1875, we see that complainant before that time is “trying to obtain money from one of the defendants.”
Controlled by the rules of evidence applicable to proof of defenses of this character in an answer, we think that no partnership is established; that no binding agreement as to any investment in land is shown, and that there is nothing as to what happened in this matter to excuse the sureties upon the bond.
The short delay to institute suit in this case does not relieve the surety. Even upon a simple contract of surety-ship independent of express conditions, such as are stated in this bond, mere indulgence at the will of the creditor extended to the debtor in no way discharges the obligations of the surety. It is a settled rule that there must he a valid common law agreement to give time, founded of course on a good consideration, to have this effect. (5 How., 207; 2 Ran., 328; 1 Leigh, 435; 12 Wheat., 554; 44 Ind., 67.) What we have said disposes of all questions arising strictly from the pleadings in this case.
It is urged in brief that the guardian had no authority to receive or receipt for the estate until an order determining the distributive share of'.the estate is made. The defendants in their answer admit that the sum received by the guardian “was the distributive portion of the proceeds of certain real estate belonging to C. P. Knapp.” The receipt of the guardian is on account of the “distributive share of Chester P. Knapp,” and the order of the court in the-matter of the account of the executor treats the fund as the distributive share of the ward.
This is no action upon the bond of an administrator by a legatee or distributee, (1 Fla., 242; 5 Pick., 61; 5 N. H., 68; 13 Vmt., 135; 34 Minn., 372; 1 Murf., 1; 1 Wall., 335.) This suit is in chancery for an account, and it is'not necessary to show that there has been an account in the Probate Court fixing the balance due./
The ward can seek a court of- equity for the purpose of an account and a consequent decree. This is the rule except where the bond and the statute regulating the duty of the guardian is 'otherwise. We have in this State no such statute. The appellants insist that the record of the Probate Court does not show the authority of the executor to make the deed to Hampson; that it does not disclose whether any petition was filed, nor does it show upon its face jurisdiction of the subject matter or the parties.
No such question as this was in issue under the pleadings. The defendants, ás we have before 'stated, admit in their answer'that the amount which" is in question here was ‘‘the distributive portion of the proceeds' of certain real estate belonging to the estate of C. P. Knapp, deceased, the father of complainant.”
The only issue in these pleadings to which this partial record of the proceedings of the Probate Court was applicable; was the amount of money, the .distributive share coming to the minor and received by the guardian.’ This record, it may be remarked, recites the filing of the petition. Where no such question is in issue, we cannot presume, in the absence of this petition, that it did not contain a recital of the jurisdictional facts.
The part of the recital here introduced was simply to show how and in what relation the guardian was chargeable with this money as well as its amount. It was admissible as evidence of these facts. No question* as to the validity of the sale of the land arises in this case.
The decree is affirmed.